I'm not sure, by the way, that we need 15 minutes aside in this case, so if you could do it in less, that would be nice. I'm sorry? I'm not sure that we need 15 minutes aside in this case, so if we could stand for less, that would be nice. Go ahead. I've been assigned. Although I know we have two defendants, so that may be the problem. How are you dividing your time? Five minutes for me and 10 minutes for Mr. Reichel. I see. Go ahead. My name is John Ward. May it please the Court, I'm here on behalf of Defendant Larisa Sakhansky and I'm going to talk about the jurisdictional element of the offense. And it seems to me, and I could be wrong, that the government's position in this case is essentially that any commercial enterprise automatically satisfies the jurisdictional requirement. Isn't that exactly what the holding was in Russell? Well, that was for rental property. There are certain, as a matter of fact, I'd like to turn, well, excuse me, I didn't mean to interrupt you. Go ahead, Your Honor. That was rental property. Well, as this Court What's the difference between running an apartment house and running a plumbing and handyman outfit? Well, I don't think the story ends there, Judge Bea. In United States v. Mahan in 2015, this Court went into this whole business, and there are certain activities that are per se affecting commerce. Rental property is one of them. And in Mahan, this Court extended it to restaurants. Okay. Then there are, on the other hand, situations where, as a matter of law, the commerce clause is not the jurisdictional element is not met. Like in a private enterprise, a private house completely, I think that was Jones, right? Precisely. Precisely. But this wasn't a private house used for business. It was. And what I'm proposing to Your Honor is that that's not enough, that between the two extremes of yes and no, there's the middle ground that, as Mahan says, has to be decided on a case-by-case basis to the satisfaction of the juror. Are you aware of any case in which there was commercial activity in a house that was subject to arson and was not committed to being in United States? Well, not offhand. But, however, I do say that the principle that each case must be decided on its own facts holds true. Well, yes, but the question is what's the standard? And the question is whether, if there is commerce being conducted from the house, is that sufficient? Well, no. It's interstate commerce or affecting interstate commerce. And that's where I think the government missed the boat this time. We have dozens of Hobbs Act cases where it's a plain stick-up. You know what a Hobbs Act case is? Yes. We have dozens of Hobbs Act cases where there's a plain old stick-up. Right. Of a 7-Eleven. Right. And it turns out, you know what? Gum from 7-Eleven comes from Chicago, from the Wrigley Company. And that's a sufficient interstate commerce. Now, here you have the defendants carefully taking their Honda and Hitachi wares that they use for their business and moving them outside the house before it burned. Now, if they're using foreign equipment for their business, why isn't that like the gum in the 7-Eleven store? Because what that would mean is that as long as you have a commercial enterprise, you've passed the test. And Mahan specifically refuses to go that far. Which case? United States v. Mahan. It's cited in my brief and relied on by the government as well. They specifically decline that. And then they go into an extended analysis showing that, in that case, it was a diversity office. Had all of these obviously interstate, they used the Internet, they invited people from out of state, blah, blah, blah. Let's stick with homes. And didn't homes, people's houses. Let's stick with houses. I thought you were referring to Justice Holmes. And so didn't the Supreme Court in Jones indicate, although it's in dicta, that where a home is the, quote, the locus of any commercial undertaking, that they would look at it differently? Well, no. What they said is that, well, you're right, it's dicta. Well, doesn't that imply that if a home is, in fact, a locus of a commercial undertaking, that you would look at it as potentially connected to interstate commerce, depending on the facts? Except for the fact that, A, it's a home, okay, as well as whatever else it is. And secondly, that arson is not an economic crime. Judge Wallace said so. Well, in this instance, it certainly was an economic crime.  But it actually was an economic crime because it was conducted for the purpose of obtaining insurance proceeds, apparently. Well, sometimes murder is an economic crime as well. But that doesn't mean that every murder, you know, affects commerce. I mean, it's a question of the – I suppose there are two streams that you could follow. One is the – that Judge Wallace followed in Papadopoulos, saying we don't want to federalize what are typically State law crimes because that affects the balance of power. And that certainly got traction in Lopez and Morrison and those cases. On the other hand, there's a tendency to read the Commerce Clause broadly, as it – like in Wickard v. Phil. But anything – by that reading, anything that is commercial is necessarily affecting commerce. That was exactly the instruction given, instruction number 22. I know that. If there was commerce, it was interstate commerce. Right. In other words, there was a peremptory instruction that there's no such thing as intrastate commerce. Well, yes, except that there is. I mean – Do you have a case that says that? Well, the fact – I'll bring you back to two. I'll bring you back to Papadopoulos, which I understand. Enough said about Papadopoulos. But also, man, the government still has to offer evidence other than just sort of common knowledge, except in those extreme – except in those cases that the Supreme Court has reached out and said, as a matter of law – Can you tell me why is an apartment house interstate commerce if it's used, but a plumbing and handyman operation, not interstate commerce? Well – Can you tell me why? Because in the one case, the connection is obvious. In the case of rental – because basically, Your Honor, because the Supreme Court said so in Russell. Okay. But that doesn't – I mean, how far can you take that out? I mean, I can see that I've – Well, are you familiar with the Fifth Circuit's decision in the Jimenez case? I am. That was a home office. I know. It was a repair-type plastering business. And in that case, the Fifth Circuit said it was covered under 844i arson. I know that it is. Why is this not in that same general realm? Because our precedent is different and more precise. That the inquiry is always, as the Court said in Odom, which I cite in my brief – I think that's an Eleventh Circuit case. I'm not sure. That what you do, once you decide that it's a commercial enterprise, then there's a three-part inquiry. What is the function of the building? Is the function of the building involved in commerce? And three, does the commerce in which the building is involved sufficiently affect interstate commerce? And I say the only evidence that the government presented, you know, for a sort of Wickard-type analysis in this case, came after the case had – after they'd been found guilty by the jury. And correct me if I'm wrong. You're using up your colleague's time. Oh, I'm using up my time. So thank you very much. My colleague's time. So I'll stop there. Thank you very much. Thank you. May it please the Court. I'm Mark Reichel, and I was the trial attorney. For Appellant Alexander Sikansky. And I want the Court to know at the outset that there is some confusion on the part of the government. I am not – I'm challenging the conviction on counts 1 through 3. That's at page 17 of my AOB in the argument. Counts 1 through 3, I do challenge the conviction by stating that the fraud counts have to be vacated because of the attorney testimony. If the fraud counts 2 and 3 have to be vacated because of the attorney testimony, then count 1 also has to be. That was arson to commit the fraud. But I would like to stick with the issue that just left with my co-counsel here. Specifically, this Court brought up Jimenez. Jimenez could not be more different. There was 20 years of activity at the house in Jimenez where employees came and got their paychecks from. The entire business, a big business, was operated out of the house, actually an attached part of the house. In this case, Sikansky was a plumber. He was engaged as a plumber. If an attorney works for a firm and comes home at night, maybe brings their laptop. Ginsburg. That isn't what happened. He had a business in his house which he advertised in the yellow pages and which he licensed and registered and from – and I gather he also worked as a plumber for somebody else, but he also had a business out of his house. There is no evidence in the record in the trial that he ever did any handyman work. He had an advertisement that was, I think, 4 or 5 years old and it expired. I think it's 5 years old. I thought he had a current license for himself. Current license. Business license. Business license. The business license, first of all, was expired. However. As of about a day ago. And he had an application in for another one, so there was really no gap. If he had 20 different business licenses for 20 different businesses but never acted on it, there's no active employment, there's no active employment from that house, from that building in commerce in any way. He's simply a plumber whose tools he took to – his tools were supplied by his employer and he was a WT employee. That was the evidence. In addition to whatever. I mean, so why was he – I mean, the fact is he had a business license to run a business out of that house. And he has – he had a business license that's expired. Even if it wasn't expired, like I say, that doesn't – Am I right that it was expired about an hour before this all happened and then he applied for a new one? In other words, it expired on April 30th and he had a new application in for May 1st. I mean, it isn't like he had given it up. I think you have to have some active employment in commerce. Just having a license and doing nothing more. That was just indication that he had a business. It wasn't that he wasn't doing anything else. It takes a resident – it takes an average home where one goes out during the day and works somewhere and has also applied for a business license at some point that will have nothing to do with the home. The business license means a business where you'll go to other homes. You won't bill from there. You won't have employees there. You will do the work from other homes. Yes, he applied for a business license and that's the sum total. But contrary to that is the actual evidence that he never did that business. Are you saying that he did not in fact run a business out of his home? Is that your position? I am saying that. Yes, that is my position. Even though he had tools that were supplied there? Even though he had a truck that was kept there? He had a truck and he had tools, Your Honor. Correct. And that was his only business was to be a plumber and he represented himself as a handyman, did he not? Many – that's correct, Your Honor. Many – well, he represented – What business did he do other than the business that was run from his house? He did no business run from his house. He did no business of any kind at all, you're saying? No. There's no evidence in the trial that he did. Does not – are you saying that a plumber doesn't do any business? A plumber who is employed by a plumbing company – Are you saying that all of the work that he did was as an employee for another person and he had no independent business where he took customers of his own? That's correct, Your Honor. There's absolutely no evidence of that in the trial court. None is my strong position here. Now, to me, it's no different than someone wanting or having the desire to do something different. But in modern day, that's everyone. Many people have a job one way and think, I'm going to become someday a computer programmer or something, or whatever they're going to do, or build websites or something. And so they then get a business license, not meaning they're going to operate out of the home, but a business license. Now, there's no evidence. I know the government had some small evidence that in a banking account that he had deposited money. Well, there were a number of deposits, weren't there? There's no evidence those weren't the paychecks from his employer. Except that it was an account for Alex's Plumbing. Alex's Plumbing is – And a signature card for Alex Kazansky Handyman was an account opened on March 25, 2008. That stayed open? That stayed open. And that's the deposits that were shown at trial. And deposits were made into the account in May of 2010, just before and after the fire. Where he had his employer come testify that he worked for him and worked for him only. Well, yes, but this was an account for the business. It wasn't an account for a personal account. I understand what the Court just said. That's not incorrect. But I can go open a business account right now somewhere for an electrical job. You can. But, sure, but is this – it's possible he was putting his private paychecks in there, but the indication – I mean, he opened up an account for the business for some reason and was putting money in it. Was he a subcontractor or was he an employee? An employee, pursuant to the testimony of Mr. – it starts with a C. I don't have it in front of me. I think it's Conra. Mr. Conra was the employee who was with him. It sounds like the day of the fire was the employer who was with him the day of the fire. And he says he was a W-2 employee. And he supplied the tools, very importantly. I texted him or called him and told him where to show up, where the job site was, because Mr. Conra was the owner of the company. And then Mr. Sikansky showed up. I just think it transforms every home into the subject of an 844-I. Didn't a witness called Mache testify that Sikansky explained he was having difficulty getting a plumber's license so he was doing general contracting work? An employee doesn't need a plumbing license. An employee doesn't do general contracting work. That's correct, Your Honor. She has no time frame. She was a next-door neighbor for a long period of time. And she talked about things during the recession and so forth. But she didn't talk about the time frame of 2010 that he was employed. We put his employer on who said from 25 to 30 hours a week. When he left me, he picked up the kids. They had seven kids or whatever it is. And Ms. Mache said my understanding in conversations with him was that there's no time frame given. So the defense put on specific time frame to prove he was an employee. Your time is up. Thank you very much, Your Honor. Thank you very much. Good morning, Your Honors. My name is Nirav Desai, and I represent the United States in this matter. This Court should affirm the defendant's convictions and the district court's decisions below because the evidence presented to the jury was sufficient for a rational jury, and this jury did find that. Can you address the argument that was just made by Mr. Reinkel that Sikansky was simply an employee of somebody else and he didn't run a business either as a handyman or a plumber or a general contractor or any business at all? He wasn't involved in any commercial transactions out of his house. He was simply coming home with his employer-provided tools and going out from his home using those tools and truck for his employer. Do you agree with that analysis? I do not, Your Honor. Why? During the trial, two witnesses that worked with Mr. Sikansky testified for the defense. There was Scott Colmar who did testify that he provided work to Sikansky from time to time. I disagree with counsel's representation that on the day of the fire, that Scott Colmar testified that on the day of the fire that the defendant was working for him. There was another defendant named Mike Heath who testified that he understood Alexander Sikansky had his own business. Wait. In the first instance, that would fit with the description of Judge Bea that this person was just an employee of somebody else? Yes. But that wasn't the full extent of Mr. Sikansky's business. I understand that. But the first example would not support your position that he was operating a business out of his home. Well, Your Honor, the defendant could be performing work for another individual and could have his own. But it doesn't provide any evidence of that. Yes, Your Honor. Okay. Go ahead. And, Your Honor, Mr. Sikansky's work goes beyond simply performing some tasks for Scott Colmar. As the Court has pointed out, Mr. Sikansky, the defendant had business licenses that ran from the time prior to the fire to after the fire. The defendant was using the. But the problem is what you don't have is any body, any check, any bill he ever submitted to anybody as an independent business person, anybody who said they were a customer of his for Alex's Handyman. Do you have any evidence that Alex's Handyman business actually did any business? Aside from the licenses that showed that this was an active business concern. Well, it showed that he had he was applying for a license to have a business. But was it a business? Yes, Your Honor. And it's important to remember the standard on sufficiency of evidence, that it's taking the evidence in the light most favorable to the government. I know. So let me hear what it is. What is it? Yes, Your Honor. That he actually ran a business as opposed to was fired to run a business. Your Honor, the evidence of the bank records that the United States put into trial were two accounts. One account was for Alex's Plumbing, and the other was for Alex's Handyman. The Alex's Handyman business checking account, it's a business checking account in the name of Alexander Sikansky doing business as Alexander's Handyman, has deposits and withdrawals going in and out of the account, including on just before the fire and just after the fire. Were these deposits simply from his employer, as was represented a moment ago by Mr. Reichle, or were they deposits by customers that he was doing work for as Alex's Handyman? The deposits, the deposit detail was not in evidence and was not presented to the jury. It's simply the monthly statements that were presented to the jury that showed deposits going into the account. So we don't know where the deposits came from. They could have come from Mr. Komar as an employer. Could be payroll checks. Your Honor, the inference a rational jury can draw is that that money is going into a business checking account for this individual's business, which is independently We could put an account calling himself Metro-Golden-Mare and deposit his payroll account. Would that allow a jury to think he's in the movie business? It depends on if the individual was using his home as the locus of a commercial activity in the movie business. You have a home that advertises itself, but where's the evidence that he actually in answer to Judge Berzontoff's question, actually did any billing as an independent contractor or the business? Well, Your Honor, during his examination under oath, Alexander Sikansky testified to the insurance company that he had worked the day of the fire. Well, what does that prove? I mean, we seem to know that he worked for this Scott person who employed him. Well, Your Honor, it shows that Alexander Sikansky was working at the time of the fire. At least, to be honest, this was, you know, whether it's marginally sufficient or not, it was really not a very good job of proving that he actually did any business. It seems like you should have brought somebody in and said, you know, I hired this man as my handyman and I paid him a check, and he didn't do that. Well, Your Honor, the United States presented evidence that a rational jury could infer support that the defendant was engaged in that. You keep saying that as a conclusion, Mr. Desai. We're not interested too much at this point in your conclusion. What we'd like you to do is to point to some evidence of some actual act which shows that this was an independent contractor and not an employee of the contractor. Could you do that, please? Yes, Your Honor. Scott Colmar testified that on occasion he provided work to Alexander Sikansky but the record is replete with evidence that Alexander Sikansky was running a business. Well, he was trying to – he was advertising that. Well, let me ask you this. Suppose all we knew was that he was advertising a business and taking out business licenses and, in essence, wanting to have a business. I mean, trying to get business. And we don't know that he ever got any business. Is that sufficient for purposes of the statute? He was – he was, you know, aspiring to do business as Alex, as handyman. That you've proven. Whether – does it matter whether he actually ever did business as Alex, as handyman? Your Honor, that could be sufficient. There are cases such as Clark out of the Seventh Circuit where you have a commercial property that is not actively in rental circulation or being leased that's being prepared to be leased. And that has been held to be actively employed. Let me ask you a conceptual question. Is there – my understanding would be that the only arson conviction was arson for purposes of fraud, right? No, Your Honor. There was also a separate arson? Yes, Your Honor. This appeal concerns, in regards to the interstate commerce issue, concerns count five. Which is just arson, arson. Correct. Arson under 844i. Go ahead. Can I ask you, Mr. Desai, with respect to your characterization of the testimony of – is it Mr. Polmar? Polmar, I believe. Polmar. C-O-L-M-A-R. You said that he testified on occasion that Mr. Sikansky worked for him. And we can examine that carefully word for word. But did he testify that it was a now-and-then type of relationship? Or did he testify that he was his employee and he worked for him all the time? My understanding of the testimony was that Mr. Polmar testified that it was on occasion that he employed Mr. Sikansky. Did he say that it was as an employee, or was he subcontracting to Alex's Handyman or Alex's Plumbing? My understanding is that Mr. Polmar testified that he issued a W-2 to Sikansky. Okay. They issued a W-2. Yes, Your Honor. That's usually to an employee. Yes, Your Honor. And, Your Honors, it's important to take a step back to where the rule from Russell and Jones, what those rules, what the Supreme Court was pointing to in Russell and Jones. In Russell, the Supreme Court stated that Congress at least intended to protect all business property, as well as additional property that might not fit that description and perhaps not every home, but to cover all business property. And Jones held that a home that's not used for any commercial purpose would not fall within 844i's jurisdictional component. Here we have a business or a home that was used just for that. It was for an active going business concern. But wait a minute. That's the question, not the answer. I mean, you say it's an active going business concern. Again, it seems to me you've perfectly well proven that he was putting himself out to conduct business. But the only evidence that I can tell from which one could infer that he actually did business is the bank account. Anything else? And that, you know, it's some evidence, since he had a separate bank account for Alex's plumbing and a separate one for Alex's handyman. Do we know that he also had a separate just personal bank account? That is not on the record, Your Honor. We don't know that. Okay. Not on this record, Your Honor. But, Your Honor, I would point to the tools that were the photographs of the tools that were introduced at trial. The tools were voluminous, and they had been, in the governance theory of the case, had been moved from the home to all these outbuildings and vehicles. And he did put, he put them on the list for the insurance. He was representing them as belonging to himself. Yes, Your Honor. That's SCR 264, 266 to 268. So he was representing that they didn't belong to his employer. They belonged to him. Correct, Your Honor. The thousands and thousands of dollars of tools listed in the insurance claim that was made under his homeowner's insurance policy, that would not be the employer's tools. And what about the truck? What connects that to his own personal business? Your Honor, in the business license, excuse me, licensing records, Sikansky listed that Chevy Silverado 1500 truck as the vehicle to be used in connection with the business. That truck was then seen arriving at the arson scene the day after the fire. So that's Sikansky's business. It didn't have a sign that said Alex's Handyman or anything like that. No, Your Honor. There doesn't appear to have been any sort of decaling on the truck. But that is the truck that he listed as being his business vehicle for Alex's Handyman. It's not for Scott Colmar, not for some other employer, but for his business. So taking the evidence together, the tools, the business licensing records, the bank records, the truck, how he described his home-based business in the licensing records. And did some, was there some testimony that he, by people who knew him, that he actually, Mike Heath, a plumber, testified that Alexander Sikansky worked as an independent contractor. So that suggests that he was actually operating as other than an employee. Yes, Your Honor. And as well as. You know, you could have done all this yourself, i.e., when you were asked to recite the evidence, you could have recited it. But you didn't recite it. We just had to pull it out of you. I apologize, Your Honor. Right. So taking together that evidence along with the yellow page advertising, which listed Sikansky's cell phone as the business contact, which is also the business cell phone that's listed on the business licensing documents. We're trying to get evidence that he actually did business, as opposed to wanted to do business. Your Honor, the evidence is as a. Unless you want to stand here and argue, and you may be right, that it doesn't matter whether he actually did business as long as he put himself out as a business person. Your Honor, the government's position is that if, even if he were preparing to do business, he would be engaging in a commercial concern, similar to the case where an inactive property that's being prepared for entry into a commercial market, a rental market, a leasing market, would also fall within 844i's jurisdictional ambit. But on the facts of this case, he was. And Ms. Mace did say also that he was doing general contracting work. Yes, Your Honor. Patricia Mace. There are several people who purported to know that. But that's not what the instruction said. The instruction said a building is used, not a building is prepared. And, Your Honor, the United States' position in this case is that the property was being used for a commercial purpose for the reasons that we discussed with regard to the evidence. The United States' position is that taking the evidence together, the inference the jury could have reached and did reach was that this was an active commercial concern that the defendant was using as Alex's handiwork. I think that's your conclusion, right? Excuse me, Your Honor? I think that's your conclusion. You've repeated that several times. I apologize for being repetitious, Your Honor. Okay. Your Honor, in regards to just a couple of more issues, if the panel is ready to move on from that question, as far as the instructional error that was raised by the defendants in this matter. Why don't you address the attorney's evidence? So, Your Honor, the counsel's primary argument is that there was a lack of activity. And, Your Honor, if there's a specific piece of evidence that you'd like me to address. I thought the argument was that there was a violation of the attorney-client privilege and the evidence shouldn't have come in. Oh, I apologize, Your Honor. Yes, Your Honor, the letter that was at issue and the testimony that was issued with regard to Jerry Chong simply didn't implicate the attorney-client privilege. It was a nonprivileged communication from Mr. Chong's office to opposing counsel in the insurance matter. And Mr. Chong was not asked any questions that would divulge an attorney-client communication or a confidential one at that. And the questioning was very tailored to the simple use of the mails to or the identification of the letter and use of the mail to mail that letter. The attorney-client privilege simply isn't implicated by the testimony that was inquired of with Mr. Chong. I see that my time is running up. It has. Thank you very much. Okay. Thank you, Your Honors. You may have a minute. Thank you. I will note that although we don't have any evidence of where the checks came from, the two deposits in May of 2010, the month of the fire, were on May 10th and May 24th, which is 14 days apart, which appears to be a two-week cycle, which I will submit as common. Well, that's a ridiculous inference. Thank you, Your Honor. Additionally, I will note that a pickup truck and tools. All right. This is what I understand to be the evidence that we pulled out that seems to support the fact that there was an ongoing business. There were tools that he claimed as his own, a substantial number of them, which he didn't attribute to his employer, right, for which he submitted reimbursement to the insurance company. Every home has tools. Every home has tools. Well, these were apparently substantial contractor tools. At least we could look at them and see. There were the bank accounts. There were Mace and Heath both giving testimony that he did operate as an independent. He said he didn't operate as a private business. He said he didn't? Heath said he did not have his own business. I thought Heath said that he did. No. Heath, Mr. Heath, testifies in Reed-Iraq that he didn't have his own business. Well, well, look. Okay. There were the ads. There were the licenses. There was the fact that he renewed the licenses every year, which would be an odd thing to do if you were not to pay and bother to do that if you weren't running a business. In other words, it would be one thing to do it once or twice, but he did it right at this point. He was renewing the licenses. Again, that goes to desire, I believe, and there's no context. Well, yes, except that at some point you give up if you're not getting anywhere. So that's what I see as the evidence and the truth. Again, I would say that everyone that testified. Thank you. Did the Court say thank you? I said thank you. That is, you're over your time. Thank you. I'm sorry. You're over your time. Thank you. Thank you. Okay. In the case of United States v. Sikansky is submitted. We'll do Kel v. Mentor Graphics, and then for purposes of planning, we'll take a very short recess after that.
judges: Berzon, Bea, Berg